**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELE D. HERRERA, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | No. 11 C 7376 |
| v. | ) | |
| | ) | Magistrate Judge |
| | ) | Arlander Keys |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
|     Defendant. | ) | |

**<u>Memorandum Order and Opinion</u>**

This case is before the Court on Michele D. Herrera's motion for summary judgment. She seeks remand or reversal of the Commissioner's decision denying her applications for Disability Insurance Benefits and Supplemental Security Income.

**<u>*Background and Procedural History*</u>**

On September 29, 2008, plaintiff Michelle D. Herrera filed an application for Disability Insurance Benefits ("DIB") and, on September 28, 2008, she filed an application for Supplemental Security Income ("SSI"). On both applications, Ms. Herrera alleged disability due to multiple sclerosis, depression, and allergies, beginning February 27, 2008. The Social Security Administration denied her applications initially on July 29, 2009, and upon reconsideration on January 22, 2010. Ms. Herrera requested a hearing before an administrative law judge, and the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is, therefore, substituted for Michael J. Astrue who served as Commissioner when this case was filed. See Fed. R. Civ. P. 25(d)(1).

case was assigned to ALJ Lovert F. Basset, who held the requested hearing on December 2, 2010.

Ms. Herrera appeared and was represented by counsel at the hearing before the ALJ. She testified that she lives with her boyfriend, her daughter, and her three grandchildren and that this is a temporary situation; on an October 12, 2009, Function Report, Ms. Herrera reported that she lived alone in a house. Record at 45-46, 222. She testified that she worked in the automobile sales business during her career and worked mostly for Mid-Town Toyota for the first 15 years. Record at 38-39. She testified that she also worked at Bosak Mitsubishi, Metro Toyota, and Napleton Dodge, Jeep and Chrysler. Record at 39-41. She testified that she left the work force on February 27, 2008, when she was laid off from Napleton, ostensibly for economic reasons. She testified that, before she was laid off, she was working as an assistant to the office manager. Record at 43.

Ms. Herrera testified that she was diagnosed with Multiple Sclerosis twenty years ago. Record at 45. She testified that her functioning is generally worsening but that she experiences intervals during which her symptoms lessen. Record at 47. She testified that fatigue is her biggest symptom, and that she also has difficulty concentrating. Record at 44, 45. She testified that, while she was working, she could not finish her work in the time allotted because of difficulty concentrating, fatigue, and

2

lack of energy. Record at 43-44. She testified that her fatigue caused her to fall asleep at her desk and that she was taking a prescription given to her by her neurologist to help her get through the day. Record at 44-45. She testified that the dealership never called her back and that she heard rumors that the company thought she was slow. *Id.* She testified that her walking is currently okay but that she feels the need to pay attention because her balance is bad and she trips a lot. Record at 47-48. She also testified that she is easily distracted and has difficulty handling stress, especially when dealing with new things. Record at 94-95. She testified that she has difficulty following recipes and that she makes mistakes. Record at 96.

With regard to her daily routine, she testified that it takes her a long time to accomplish any tasks; specifically, she testified that it takes her two hours to get dressed in the morning. Record at 90. She testified that she normally gets up at 9:00 a.m., drinks coffee, walks around, takes a shower, and gets dressed. Record at 92. She testified that these tasks would be completed around 11:00 a.m., and that she then makes sure her bills are paid, which she has to check every day because she gets confused and is afraid she has forgotten to do something. Record at 93. She testified that she has to push herself to get any daily tasks done and that, after completing tasks outside of the home, such as going to the grocery store,

3

she is unlikely to be able to complete any further tasks. Record at 91. She testified that she would probably not be able to sit all day at a job and that she is unable to even watch a movie without falling asleep. Record at 92. She testified that she usually goes to bed around 10:00 p.m. and gets eleven hours of sleep per night. Record at 92, 98. She testified that she still has to rest during the day and needs more rest if she performs any physical activity. Record at 98. She testified that she has good and bad days with her symptoms, and that she has difficulty getting up the next day after working extraordinarily hard, such as after making Thanksgiving dinner. Record at 97. Ms. Herrera testified that she is afraid to drive due to her poor reflexes and that other drivers often honk at her due to her slow driving and swerving. Record at 46. She testified that the last driving mishap she experienced was an accident with a barricade when she was working at Mid-Town Toyota. *Id.*

The ALJ also heard testimony from Dr. Ronald Semerdjian, a Medical Expert ("ME") who had listened to Ms. Herrera's testimony and read her electronic folder. Record at 48. The ME testified that Ms. Herrera's significant impairment is her Multiple Sclerosis and that, based on her medical records, Ms. Herrera has slow processing speeds and will be "somewhat impaired" in performing her work. Record at 48, 52-53. He testified that, after reviewing the medical records, he believed Ms. Herrera to

4

be affected cognitively and not as much physically.  Record at 49-50.  He testified that he suspected her concentration was affected due to her slow processing of information.  Record at 53.  Ms. Herrera's attorney questioned the ME about Ms. Herrera's fatigue, and the ME determined that he was missing a portion of the record, which contained medical reports concerning Ms. Herrera's fatigue. Record at 54-57. After reviewing the missing portion, the ME testified that he maintained his position that Ms. Herrera's impairments are primarily cognitive. Record at 62.

The ALJ also heard testimony from Lee Knudsen, a Vocational Expert ("VE") who heard Ms. Herrera's testimony before the ALJ and reviewed Ms. Herrera's exhibit file.  Record at 63.  The VE testified that Ms. Herrera's past work could best be characterized as an accounting clerk, classified as sedentary and skilled at the lower end per the DOT.  Record at 63.  The ALJ posed a hypothetical to the VE that concerned an individual with the same education, work history, and limitations as Ms. Herrera, and the VE testified that this hypothetical individual would still be able to perform the light, unskilled information clerk job, as well as work as a cleaner, such as a motel maid.  Record at 76-77.  The VE testified that there are 15,000 jobs available for the light, unskilled cleaner and 4,000 jobs for the light, unskilled information clerk.  Record at 77-78.  He testified

that, if the hypothetical individual were moderately limited in her ability for up to one-third of the workday, then she would be unemployable. Record at 82. Moderate limitation means a significant compromise of an individual's ability to maintain attention, perform activities in a schedule, be punctual and maintain regular attendance, perform without interruptions from symptoms, to work at a consistent pace and without unreasonable rest periods, and to accept instruction and criticism. Record at 81. The VE then testified that if an individual has these problems, she is not precluded from employment but that these problems increase the likelihood that the individual will do something that would cost her the job. Record at 85. The VE testified that, even for a simple, unskilled job, if an individual is found to be unfocused 10% of the time or more on a regular basis or takes frequent breaks, the individual is likely to lose the job. Record at 84-85. The ALJ noted that the report prepared by Ms. Herrera's reviewing psychologist indicated moderate limitation, but that it contained "internal inconsistencies" and that the report should not automatically be accepted. Record at 86-89.

In addition to the testimony of Ms. Herrera, the ME, and the VE, the record before the ALJ includes medical records. The records show that Ms. Herrera has been under the care of a neurologist, Dr. George Katsamakis, since December 15, 1999.

6

Record at 335. However, the first treatment note included in the record is November 2, 2007. Record at 265.

On November 2, 2007, Dr. Katsamakis examined Ms. Herrera and noted that he last saw her nearly two years ago, but that she had been under the care of Dr. Stefoski at Rush for the last year. Record at 265. Dr. Katsamakis reviewed MRIs from October 2007 and compared them to films done in 2006 and images taken in 2002, finding that there was a significant burden of disease, particularly in the left hemisphere. *Id*. He noted that Ms. Herrera had been receiving Tsyabri for a year and that the MRI films did not show any changes while she had been on Tysabri. *Id*. He noted that Ms. Herrera continued to have fatigue, memory loss, and speech problems. *Id*. He observed that Ms. Herrera

> is alert and oriented with essentially normal cognition, although there are subtle speech difficulties including mostly expressive more than receptive aphasic errors. Visual acuity is 20/20 with no red desaturation or afferent papillary deficit. Cranial nerves V and VI...[and] VII through XII are normal. Finger-nose-finger and heel-nose-shin are without dysmetria or tremor. Strength is 5/5 throughout with normal tone. Deep tendon reflexes are symmetric and plantar responses are mildly extensor, by probable more withdrawal. Visual fields are full. There is no nystagmus, diplopia, or afferent pupil. Gait is normal to heel, toe, and tandem.

*Id*. Dr. Katsamakis's impressions were that Ms. Herrera had relapsing MS that was stable on Tsyabri for one year, and he recommended that she schedule follow-up visits every three to sixth months. Record at 265-66.

7

Despite that recommendation, Ms. Herrera next saw Dr. Katsamakis on October 25, 2008. At that time, he noted that Ms. Herrera had not seen him in nearly a year, even though she was aware that regular follow-up was recommended. Record at 263. Dr. Katsamakis noted that Ms. Herrera's primary symptoms were "disabling fatigue, excessive sleepiness, bladder urgency, frequency and incontinence and forgetfulness," and stated that Ms. Herrera was taking Tsyabri and Lexapro 10mg a day. *Id*. Dr. Katsamakis noted that Ms. Herrera had no side effects on Tsyabri and no new neurological symptoms. *Id*. He also found no focal deficits on exam. *Id*. He recommended that Ms. Herrera "have an MRI of the brain done as soon as possible to compare to studies done one year ago on Tysabri...[and] CBC, metabolic panel, JC virus, PCR and T-cell ratios done every year on Tysabri." *Id*.

On November 19, 2008, Ms. Herrera received a brain MRI that revealed "[f]indings consistent with the patient's history of MS. No enhancing lesions identified." Record at 357. At a follow up appointment on December 4, 2008, Dr. Katsamakis noted that the November 2008 MRI revealed the burden of her disease to be consistent with prior MRIs. Record at 262. Dr. Katsamakis stated that Ms. Herrera had no new neurologic symptoms since her October appointment, but that she was a little more depressed and was taking Lexapro 20mg every other day. *Id*. Dr. Katsamakis switched the prescription from Lexapro to generic citalopram and

increased intake to daily. *Id.* On March 2, 2009, Dr. Katsamakis wrote a letter to referring physician Dr. Hayes in which he stated that Ms. Herrera "suffers from significant cognitive disability causing forgetfulness, confusion and slowed processing speed...[and] physical fatigue," that she may be suffering from depression (as exhibited by "decreased motivation and mild depressive symptoms"), and that she had mild expressive aphasia and a little imbalance during her exam. Record at 260. Dr. Katsamakis opined that Ms. Herrera's MS is relapsing and that she is clinically stable but has cognitive effects and, to a lesser extent, physical effects. *Id.* Dr. Katsamakis recommended increasing Ms. Herrera's citalopram to 40mg a day and continuing her dosage of Tysabri. *Id.*

On April 6, 2009, Dr. Katsamakis wrote another report to referring physician Dr. Hayes, in which he stated that Ms. Herrera was doing well since beginning Tysabri in November of 2006 and that she had no new neurologic symptoms. Record at 342-43. Dr. Katsamakis noted that Ms. Herrera suffers from significant cognitive impairment, including forgetfulness, confusion, and slow processing, as well as the physical impairment of fatigue. Record at 342. He noted that Ms. Herrera may be suffering from some depression; that she had mild fever, chill, nausea and vomiting a few weeks before her examination; and that "other than a mild expressive aphasia and a little bit

9

of imbalance, she had no focal findings on exam." *Id.* Dr. Katsamakis recommended increasing citalopram to 40 mg a day, continuing Tysabri, and following-up clinically in three to four months. *Id.*

On May 7, 2009, Dr. Fauzia A. Rana examined Ms. Herrera; he assessed no difficulty in performance aside from moderate difficulty in tandem walking, and he stated that Ms. Herrera was "able to sit, stand, walk, carry, handle objects, hear and speak without limitations." Record at 272-73. He noted that Ms. Herrera complained of a history of asthma as well as depression. Record at 270. He observed that Ms. Herrera was 62 ¾ inches and 179 ½ lbs., and that a review of systems was noncontributory aside from her 15 pound weight gain in the last year. Record at 271. He observed that Ms. Herrera was alert, properly oriented in time, place and person, and was cooperative and not distressed. *Id.* He observed that her speech, hearing, skin, head, eyes, ears, nose, throat, mouth, and neck were normal and did not display any abnormalities or issues. *Id.* He observed that Ms. Herrera has a normal gait but is unable to walk in a straight line; he also commented that she does not use an assisted device. Record at 273. Dr. Rana's diagnostic impressions were multiple sclerosis and "hyperreactive airway disease and asthma." *Id.* Dr. Rana did not review Ms. Herrera's medical records. Record at 270.

Also on May 7, 2009, Dr. Ana A. Gil completed a 46 minute Psychiatric Examination and diagnosed Ms. Herrera with "major depression recurrent without psychotic features- moderate in severity." Record at 281-84. Dr. Gil noted that Ms. Herrera claims she sleeps 12 hours a day; that she complains of distractibility, variable appetite, hopelessness and helplessness, anhedonia, increased social isolation, and impaired short-term memory; and that Ms. Herrera denied having suicidal or homicidal thoughts, hallucinations, a history of alcohol or drug usage, thought broadcasting, thought control, thought withdrawal, or though insertion. Record at 281-82. She stated that Ms. Herrera was alert and engaging during the interview, and "appeared sad, restricted and appropriate to content. Her mood appeared moderately depressed." Record at 282. Dr. Gil checked the following boxes to indicate symptoms of Ms. Herrera's depressive syndrome: "[a]nhedonia or pervasive loss of interest in almost all activities," "[s]leep disturbance," "[p]sychomotor agitation or retardation," "[d]ecreased energy," "[f]eelings of guilt or worthlessness," and "[d]ifficulty concentrating or thinking." Record at 288. Concerning the "B" criteria, Dr. Gil determined that Ms. Herrera experienced a mild degree of limitation of her daily activities; moderate limitation in maintaining social functioning as well as concentration, persistence, or pace; and no limitation in the form of episodes

of decompensation, each of extended duration.  Record at 295.
She determined that evidence did not establish "C" criteria and
"the alleged signs and symptoms d[id] not meet or equal the
listing of severity of functional limitations; however, the signs
and symptoms present as being serious and more than non-severe."
Record at 296-97.  Dr. Gil also stated that she felt Ms.
Herrera's limitations to be credible.  Record at 297.

After a July 7, 2009 examination, Dr. Katsamakis wrote to
Dr. Hayes and reported that Ms. Herrera complained of mild to
moderate bladder incontinence and disabling cognitive slowing.
Record at 344.  He stated that Ms. Herrera had no side effects on
the medication, no reactions caused by infusion, no infections
and no MS relapse.  *Id*.  Dr. Katsamakis noted that review of her
systems was unremarkable; that her affect was blunted and her
speech was mildly sub-fluent; that she exhibited a mild to
moderate tandem ataxia but that she was able to tandem step more
than five times; and that she was taking Tysabri, Lexapro 40 mg,
generic, and allergy medications.  *Id*.  He gave Ms. Herrera
samples of VESIcare 5 and 10 mg to take over a two week period
and stated that he would follow up with Ms. Herrera in three to
four months, at which point she would receive her yearly MRI and
blood work.  *Id*.

On July 23, 2009, Dr. Leon Jackson completed a Mental
Residual Functional Capacity Assessment for Ms Herrera. Record at

305-08. Dr. Jackson determined that Ms. Herrera's abilities were moderately limited in the following areas: the ability to understand and follow directions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain attendance, and be punctual; to complete a normal workday or workweek without interruptions from symptoms and unreasonable breaks; and her ability to accept instructions and criticism. Record at 305-06. He determined that her abilities were not significantly limited in the following areas: the ability to remember location and procedure; to understand, recall, and carry out simple instructions; to carry out detailed instructions; to sustain a routine; to coordinate with or work in proximity with others without being distracted; to make simple decisions related to work; to interact properly with the public; to ask simple questions; to get along with coworkers or friends; to act in a socially appropriate manner; to respond appropriately to workplace changes; to take normal precautions concerning normal hazards; to travel in an unfamiliar place; to set realistic goals; or to make independent plans. Dr. Jackson concluded that Ms. Herrera's symptoms did not meet the listing of severity of functional limitations and that Ms. Herrera retains "the functional capacity to engage in simple and routine work activities." Record at 307.

13

On July 27, 2009, Dr. Virgilio Pilapil completed a Physical Residual Functional Capacity Assessment for Ms. Herrera based on a review of her medical records. Record at 309-16. Dr. Pilapil determined that Ms. Herrera could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds; that she could sit, stand, and/or walk about six hours in an eight-hour workday; and that she had no limitations in her ability to push or pull. Record at 310. Dr. Pilapil determined that Ms. Herrera could occasionally climb ramps and stairs and could never climb ladders, ropes, or scaffolds. Record at 311. Dr. Pilapil noted that Ms. Herrera had a 19-year history of MS; that her condition was currently stable; and that her July 7, 2009 neurological exam was within normal limits. Record at 316. He noted that Ms. Herrera indicated that she had some fatigue, though the extent of this symptom could not be determined because Ms. Herrera did not return her activities of daily living (ADLs) evaluation. *Id*. He noted, however, that Ms. Herrera's statement of fatigue was credible. *Id*.

On September 17, 2009, Ms. Herrera received an MRI that revealed

> ventricular and sulcal prominence consistent with a moderate amount of cortical atrophy for age. Numerous foci of increased T2 weighted signal intensity are demonstrated within the deep periventricular white matter and centrum semiovale consistent with multiple sclerotic plaque formation. The plaque burden has not significantly changed from prior study. There are no

14

enhancing lesions seen. No MRI evidence for acute
hemorrhage, acute infarction or mass effect. No intra-
or extra-axial fluid collections. Normal excepted flow
void within the intracranial carotid and basal arteries
is present. Craniocervical junction unremarkable.
There is redemonstration of left maxillary sinus
mucosal disease.

Record at 356.

On October 12, 2009, Ms. Herrera completed a Function Report
on which she stated that she gets up when she needs to use the
restroom, that she then has her coffee, makes her bed, begins
laundry, takes her allergy medication, will try to walk outside
if it's nice, and that she must allot two hours to showering and
getting dressed. Record at 222. She stated that she usually has
to go to the store every other day because she forgets something
and that, when she does take a trip to the store, she will often
have to go back to the house to retrieve a forgotten item such as
her keys, phone, glasses, purse, or the shopping list. Record at
223. She stated that she needs to be close to a bathroom at all
times and that she has had "bathroom accident[s]" when out of the
house. *Id*. She also stated that tasks that used to take one
hour now take between two and four hours, and that she now goes
to bed between 9:00 and 10:00 p.m. She stated that she used to
be able to clean the house, follow recipes, keep things
organized, complete tasks correctly the first time, multi-task,
follow a schedule or directions, and finish tasks she had begun.
Record at 224. She also stated that her illnesses affect her

15

sleep because she has to get up to use the bathroom two to three times a night, after which she has difficulty falling back asleep. *Id.*

In reference to personal care, Ms. Herrera indicated that she takes a long time getting dressed, must concentrate when bathing so as not to fall and to remember what she needs to do, cannot do her hair without getting distracted, that a toilet must be accessible at all times, and that she must leave reminders on her mirror in order to take care of her personal needs as well as set out her Sunday through Saturday pills so that she does not forget to take them. Record at 224-25. She indicated that she is able to prepare simple foods, such as "cereal, PB+J sandwiches or frozen or leftovers." Record at 226. She indicated that she is able to clean, do laundry, and mow the lawn, and that household tasks take about twice as long as they used to. *Id.* She indicated that she goes out daily or every other day, that she is able to walk, drive, or ride in a car, that she is afraid of falling and only goes out alone when she cannot get someone to go with her, that she only shops for necessities and that she shops three to four times a week. Record at 227.

In regard to her personal finances, she indicated that she is able to pay bills, count change, and use a checkbook, but that she has to triple check her work and is constantly making mistakes and losing items such as bills and receipts. Record at

16

227.   She indicated that she likes to watch television, play
cards and board games with her grandchildren, talking on the
phone, going out to eat for birthdays, and attending church and
that, while she is still able to complete these activities, there
are activities she used to enjoy that she is now unable to do,
such as line dancing, biking, playing tennis, and cooking.
Record at 228-29.   On the list of abilities affected by her
impairments, she checked 13 out of 19 boxes: lifting, squatting,
standing, walking, kneeling, talking, stair climbing, memory,
completing tasks, concentration, understanding, following
instructions and using tasks.   Record at 229.   She did not check
the following boxes: bending, reaching, sitting, hearing, seeing,
and getting along with others.   *Id*.   She indicated that she can
only lift ten to fifteen pounds, walk for one hour before needing
to stop and rest for twenty minutes, kneel for ten seconds, that
she must hold onto something while squatting for ten seconds and
after standing for about one hour, that she can pay attention for
ten to fifteen minutes, and can follow written and spoken
instructions if she does one step at a time.   *Id*.   She also
indicated that she talks slowly, forgets her words, can climb two
to three flights of stairs at a time while holding onto
something, has a terrible memory, is easily distracted when
completing tasks, has bad concentration, is able to use her hands
but both are weak, is uncoordinated, and needs to repeat

something three to four times in order to understand it.  Record
at 230.  She indicated that she does not handle stress or changes
in routine very well.  Record at 231.  She checked the boxes
indicating that she uses a cane and glasses, both of which she
indicates were prescribed by a doctor.  *Id.*  She indicated that
she no longer uses knives as she considers them too dangerous for
herself, she cannot open lids on jars and has to use scissors to
open packages, that it takes her a few attempts to turn a page of
a newspaper or a book, that she is able to dial a phone, pick up
a coin, and use a pen or pencil, that she is able to carry a bag
of groceries or trash or a basket of laundry one at a time, and
that she is able to reach overhead or above waist level.  Record
at 234.  She indicated that, when getting up from a chair, sofa,
or bed, she must get up slowly, hold on, and concentrate to avoid
falling, and that she can sit for about one hour before getting
restless and having to stand or walk.  Record at 235.  She
indicated that she normally rests for five to ten minutes after
everything she does in order to concentrate on her next task, and
that she usually rests for twenty to thirty minutes after any
physical activity.  *Id.*

In his notes dated November 5, 2009, Dr. Katsamankis stated
that Ms. Herrera's

> MRI done September 2007 shows a stable burden of
> disease with no enhancing lesions and no new lesions
> compared to her prior studies. There is no evidence of

> PML.  Serum testing including CBC, metabolic panel, JC
> virus PCR, and T cell ratios was also reviewed from
> September.  The results are normal.

Record at 351.  Ms. Herrera complained of a physical fatigue,
which Dr. Katsamakis rated as 6/10 in severity, bladder urgency,
constipation, diarrhea, and depression. *Id*.  She also had mild
extensor weakness in her hands and mild tandem ataxia, and she
continued to have comfortable cognitive and physical fatigue.
*Id*.  Dr. Katsamakis concluded that Ms. Herrera's MS was
clinically stable and prescribed her generic bladder medication
oxybutynin 5 mg to be taken three times a day.  *Id*.  Ms. Herrera
was also to continue with taking Lexapro, Vesicare, and Tsybari
and to follow-up in four months.  Record at 351-52.

On November 5, 2009, Dr. Katsamakis completed a Medical
Report that indicated Ms. Herrera's diagnosis of multiple
sclerosis and listed her symptoms to be moderate ataxia, slowing
of the cognitive processes, severe fatigue, and bladder and bowel
urgency.  Record at 335-36.  Dr. Katsamakis also completed a
Physical Capacities Assessment in which he determined that Ms.
Herrera would be able to sit on a sustained basis for two hours
in an eight-hour work day and that she would be able to stand
and/or walk for less than one hour of an eight-hour workday.
Record at 337.  He determined that Ms. Herrera is unable to lift
any weight on a sustained basis; that she is able to complete
simple grasping with both hands but that she is unable to push

19

and pull arm controls or complete fine manipulation with either hands; that she cannot use either of her feet for repetitive movements on a sustained basis; that she would require one 20 minute rest period per hour if she was to return to work activity; and that she does not need to lie down for a substantial period of the day. Record at 336-39.

Dr. Katsamakis also completed a Mental Residual Functional Capacity Evaluation in which he determined the following abilities to have a marked impairment: the ability to remember locations and procedures; to remember and carry out short and simple instructions; to remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform within a schedule, maintain regular attendance, and be punctual: to sustain an ordinary routine without special supervision; to coordinate with or work in proximity with others without being distracted; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from symptoms and to perform at a consistent pace without unreasonable rest periods; to ask questions or request assistance; to respond appropriately to changes in the work setting; to be aware of normal hazards and take precautions; to travel in unfamiliar places or travel via public transportation; and to set realistic goals or make independent plans. Record at 339-41. Dr. Katsamakis indicated

that Ms. Herrera's ability to interact with the general public had a slight impairment. Record at 340. He also determined that the following abilities have moderate impairment: the ability to accept instruction and respond properly to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and accepted standards of neatness and cleanliness. Record at 340-41.

On December 30, 2009, psychologist Dr. Mark B. Langgut examined Ms. Herrera and concluded that Ms. Herrera had dysthymic disorder and Cognitive Disorder NOS. Record at 301-04. Dr. Langgut observed that Ms. Herrera "smiled easily but was emotionally constricted;" he also noted that she had poor memory, that she was alert or oriented, that she spoke directly but her voice was weak and impaired in fluency, that she was adequately dressed and groomed, that her height and weight were within average limits, and that her gait was "slow and unsteady but unassisted." Record at 301. Dr. Langgut reported that Ms. Herrera claimed she was sad due to her illness, her unemployed status, illnesses in the family, and her sons being in Iraq. Record at 303. Ms. Herrera claimed that Lexapro reduced her depressive symptoms significantly. *Id.* Dr. Langgut observed that she did not have indications of mania or suicide; that she had mild anxiety due to her illness; that she had a diminished

21

emotional presence and that her emotions were consistent with her thoughts; that she was able to remember six digits forward and four digits in reverse; that she correctly recalled the previous day's weather, what she had eaten for dinner the previous night; that she was able to name three recent U.S. presidents when asked for four; that she correctly identified the first president; that she was able to complete calculations; that she had intact judgment and thought processes; and that she appeared to be able to manage her funds, although her difficulty with memory may require her to seek assistance. Record at 304.

On January 13, 2010, Dr. Michael J. Schneider completed a face-to-face psychiatric interview of Ms. Herrera. Record at 317-29. Dr. Schneider noted that Ms. Herrera arrived on time, was emotionally constricted, had poor memory for details, maintained good eye contact, had a clear and intact sensorium, maintained direct and relevant speech, had a weak voice and impaired fluency, that she was independent in self-care, was able to do domestic chores slowly and drive in a limited fashion, had good social relations, good judgment, intact recent memory and okay long-term memory, slow thought processes, average coherence, normal flexibility and suggestibility, mildly obsessive thoughts, and limited insight. Record at 329. Dr. Schneider stated that Ms. Herrera's symptoms of cognitive impairment were credible and consistent with medical evidence. *Id*. Dr. Schneider noted an

impairment of a Cognitive Disorder NOS and dysthymic disorder, as
consistent with Dr. Langgut's report.  Record at 318, 320, 329.
Dr. Schneider found that Ms. Herrera had mild limitation in daily
living activities and social functioning; moderate limitation in
maintaining concentration, persistence, or pace; and no episodes
of decompensation of extended duration.  Record at 327.  Dr.
Schneider found that Ms. Herrera's condition did not establish
the presence of the "C" criteria, which requires a medically
documented history of a chronic organic mental disorder that
persists for at least two years and causes a minimal limitation
of the ability to do any basic work activity.  Record at 328.
Dr. Schneider concluded that Ms. Herrera had a severe impairment
but did not meet listing criteria; he further noted that her
current functioning was somewhat improved from her previous
mental status exams.  Record at 329.

Dr. Schneider also completed a Mental Residual Capacity
Assessment in which he found that Ms. Herrera's following
abilities were not significantly limited: the ability to remember
locations and work-like procedure, understand and remember short
and simple instructions, maintain attention for extended period,
perform within a schedule, maintain regular attendance and be
punctual, sustain a routine without extra supervision, work in
coordination with or near others without being distracted, make
simple work-related decisions, interact appropriately with the

general public, ask simple questions, accept instruction and respond appropriately to supervisor criticism, get along with others without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior including neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make independent plans; Dr. Schneider found that the following abilities were moderately limited: the ability to understand, remember or carry out detailed instructions, complete a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods, and respond appropriately to work-setting changes. Record at 331-32. Dr. Schneider concluded that Ms. Herrera was "able to perform simple repetitive tasks on a consistent basis as long as those tasks are not rapid paced or require frequent changes." Record at 333.

The record shows that Ms. Herrera next saw Dr. Katsamakis on February 25, 2010. Record at 350. At that time, Dr. Katsamakis determined that Ms. Herrera's MS had been relapse-free and there had been no progression of the disease or opportunistic infections. *Id.* He noted that Ms. Herrera did not show focal weakness; that her visual fields were full; that her cranial nerves were nonfocal; that her ocular movements, and pin and

24

vibration sensation was intact; that her reflexes were symmetric; that her "planter reflexes are downgoing"; that she had "very mild tandem step ataxia"; that her affect was blunted; and that "her fatigue is rated at 6/10, but she has unlimited stamina." *Id.* Ms. Herrera was on Vesicare, Lexapro, and Tysabri, and she agreed to continue with Tysabri medications after a long discussion concerning the medication's risks and benefits. *Id.*

On September 21, 2010, Ms. Herrera signed her consent to participate in Dr. Katsamakis's study of treatment interruption of natalizumab (also called Tsyabri). Record at 358-77. Ms. Herrera was asked to be in the study because she had been receiving natalizumab for at least twelve months without any MS relapses. Record at 358. The purpose of the study was to research the results after participants stopped taking natalizumab for 24 weeks. Record at 359. It is not clear in the record whether Ms. Herrera actually participated in the study or what the personal effects were, but the study allowed for four possible drugs or a placebo to be administered to participants. Record at 359-60.

On November 22, 2010, Dr. Katsamakis completed a Multiple Sclerosis Residual Functional Capacity Questionnaire, on which he identified Mr. Herrera's symptoms as fatigue, balance problems, poor coordination, weakness, difficulty remembering, emotional instability, sensitivity to hear, bowel problems, problems with

judgment, bladder problems, depression, and difficulty solving problems. Record at 378. He also affirmed that Ms. Herrera has "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance or gross...movement or gait and station," as well as fatigue of motor function with substantial muscle weakness after repetitive activity. *Id.* He also indicated that Ms. Herrea's fatigue was best described as lassitude rather than fatigue of motor function; that this complaint was typical of MS patients; that emotional factors contribute to the severity of Ms. Herrera's symptoms; that Ms. Herrera's fatigue or other symptoms is frequent or constant; that she is incapable of even a "low stress" job; that Ms. Herrera's impairments have lasted at least twelve months; that the symptoms have arisen in the last five to eight years; that she can walk approximately one to two blocks; that she can sit for fifteen minutes at a time; that she can stand for ten minutes at a time; that she can sit or stand/walk for a total of less than two hours in an eight-hour work day; that Ms. Herrera needs a job that permits her to shift positions from sitting to standing to walking; and that she needs six to eight breaks per workday for ten to thirty minutes per break. Record at 379-80. Dr. Katsamakis also indicated that Ms. Herrera can never lift or carry any weight; that she can never twist, stoop, bend, crouch/squat, climb ladders or stairs; that she is

26

significantly limited with reaching, handling, or fingering; that her symptoms result in "good days" and "bad days"; and that she is likely to be absent from a job more than four days per month that she is likely to have five to ten bad days per month. Record at 381.

On March 28, 2011, Dr. Katsamakis wrote a "to whom it may concern" letter indicating that Ms. Herrera "has a relapsing remitting form of multiple sclerosis;" Dr. Katsamakis explained that, although Ms. Herrera had not experienced a clinical relapse, she suffers from significant disability.  Record at 383-84.  Dr. Katsamakis also noted that, "[i]n casual conversation, one would not necessarily know that Michele even has multiple sclerosis but on more detailed evaluation it is pretty clear that she suffers from both cognitive and physical disability." Record at 383.  He stated that Ms. Herrera has "considerable difficulty with cognitive processing, higher executive function and attention and concentration," that her stamina is considerably diminished, and that she experiences physical symptoms such as "bladder incontinence, imbalance, weakness in her legs and depression." *Id.*  He indicated that Ms. Herrera had been responding well to her MS treatment, namely the monthly infusion, but explained that the medication does not reverse the physical and cognitive impairments associated with MS. *Id.*  He stated his expertise as a professional caring for MS patients for 15 years

27

and asked the recipient of the letter to consider his professional opinion that "Ms. Herrera is both physically and cognitively disabled by her disease and is unable to maintain gainful employment." Record at 383-84.

The record also includes a Work History Report for Ms. Herrera, indicating that she worked as an assistant office manager from 1986 to 2001, license and title clerk from 2001 to 2004, clerical worker from 2004 to 2005, and biller from 2006 to 2008. Record at 199. Ms. Herrera held all listed positions at car dealerships. *Id*.

The ALJ issued his decision on December 21, 2010, denying Ms. Herrera's claims for DIB and SSI. The ALJ determined that Ms. Herrera had not been under a disability within the meaning of the Social Security Act from February 27, 2008, through the date of his decision. The ALJ determined that Ms. Herrera met the insured status requirement of the Social Security Act through December 31, 2011; that she had not engaged in substantial gainful activity since February 27, 2008; and that she suffered from multiple sclerosis and a mood disorder, both severe impairments, as well as asthma and allergies, neither of which was severe. Record at 21-22. The ALJ determined that Ms. Herrera's impairments did not meet or medically equal a listed impairment; specifically, the ALJ determined that her multiple sclerosis did not meet the listing because there was

28

> no significant and persistent disorganization of motor
> function in two extremities, resulting in sustained
> disturbance of gross and dexterous movement or gait and
> station; no visual or mental impairments as described
> under the appropriate criteria, and no significant,
> reproducible fatigue of motor function with substantial
> muscle weakness on repetitive activity, demonstrated on
> physical examination, resulting from neurological
> dysfunction in areas of the central nervous system
> known to be pathologically involved by the multiple
> sclerosis process.

Record at 22.  The ALJ further determined that Ms. Herrera's

mental impairment did not meet the listing because her impairment

did not satisfy the "paragraph B" criteria, which requires

claimant's impairment to cause at least two "marked" limitations

or one "marked" limitation and "repeated" episodes of

decompensation of extended duration; namely, Ms. Herrera's daily

living had no more than a mild restriction, her social

functioning had no more than mild difficulties, her

concentration, persistence, or pace had no more than moderate

difficulties, and she experienced no episodes of decompensation

of extended duration.  Record at 23.  The ALJ also determined

that Ms. Herrera's mental impairment did not satisfy the

"paragraph C" criteria, which requires,

> a medically documented affective disorder of at least
> two years' duration that has caused more than a minimal
> limitation of her ability to do basic work activities,
> with symptoms of signs currently attenuated by
> medication or psychosocial support, and one of the
> following: repeated episodes of decompensation, each of
> extended duration; a residual disease process that has
> resulted in such marginal adjustment that even a
> minimal increase in mental demands or change in

29

environment would be predicted to cause the individual
to decompensate; or a current history of one or more
years' inability to function outside a highly
supportive living arrangement, with an indication or
continued need for such an arrangement.

Record at 23. The ALJ determined that Ms. Herrera had the

capacity "to perform light work as defined in 20 CFR 404.1567(b)

and 416.967(b) except that she can understand, remember, and

carry out only simple job instructions with repetitive tasks, at

a moderate work pace." Record at 23. The ALJ determined that

Ms. Herrera's allegations of limitations cannot be accepted and

that the finding of residual functional capacity is justified.

Record at 28.

The ALJ determined that Ms. Herrera is unable to perform her

past relevant work as an accounting clerk, as the mental demands

of this position exceed her functional capacity. Record at 29.

However, based on the testimony of the VE, the ALJ determined

that Ms. Herrera could perform alternative jobs that exist in

significant numbers in the national economy. Record at 30.

The plaintiff's timely request for Appeals Council review

was denied on August 22, 2011. Ms. Herrera then filed a lawsuit

in this Court, seeking review of the Social Security

Administration's final agency decision. The parties consented to

proceed before a United Stated Magistrate Judge, and the case was

reassigned to this Court on May 23, 2012. The case is now before

the Court on cross motions for summary judgment: Ms. Herrera asks

the Court to reverse the Commissioner's decision denying her benefits, or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the agency's decision.

## ***Discussion***

Applicable Law

An individual claiming a need for DBI or SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id*.

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free

from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "more than a mere scintilla," rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not, "displace the ALJ's judgment by considering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 2012 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id*.

<u>Analysis of Ms. Herrera's Arguments</u>

32

Ms. Herrera argues that the ALJ's decision should be reversed or remanded because he failed to properly explain what evidence supported his RFC assessment; failed to properly evaluate the opinion of Dr. Katsamakis, her treating doctor; and failed to make a proper credibility determination.

1. *The ALJ'S RFC Determination*

Ms. Herrera first argues that the ALJ failed to explain or support his determination that Ms. Herrera had the residual functional capacity to perform light work as defined in 20 CFR 401.1567(b) and 416.967(b) except that she can understand, remember, and carry out only simple job instructions with repetitive tasks at a moderate work pace. In particular, Ms. Herrera argues that the ALJ failed to explain with any specificity how the medical evidence supported his finding.

The ALJ determined that, "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the evidence of limitations greater than those reported above." Record at 24. The ALJ first discussed Dr. Katsamakis's treatment records; he cited to specific dates and notes indicating that the MS had remained stable and that the MS treatment recommendations did not change. Record at 25-26. Particularly telling evidence shows that despite Dr. Katsamakis's recommendation that Ms. Herrera

33

follow up with him every three to four months, there are significant gaps during which she did not schedule any visits. Record at 25, 265, 263. Specifically, Dr. Katsamakis's first note, dated November 2, 2007, states that he last saw Ms. Herrera two years prior. Record at 265. Ms. Herrera complained of fatigue, memory loss, and speech issues at that time, but Dr. Katsamakis observed that she had "essentially normal cognition," normal gait, and a stable condition. *Id*. He stated that Ms. Herrera had been stable on Tysabri for one year and recommended that she continue with the medication. *Id*. Dr. Katsamakis then recommended that she schedule follow up visits every three to six months, but she did not follow up for another year. Record at 263. During her first visit after this gap, Dr. Katsamakis noted that she suffered from fatigue, bladder incontinence, and forgetfulness, but he did not change her treatment. *Id*. During a later visit, Dr. Katsamakis observed a slight increase in Ms. Herrera's depression and switched her prescription from Lexapro to citalopram as well as increased her intake. Record at 260, 262. At a separate visit, he gave Ms. Herrera samples of VESIcare to take for her bladder incontinence. Record at 344. However, he continued to recommend a consistent MS medication and treatment regimen during all visits and labeled her condition as stable. Record at 260, 344, 350. In his most recent notes, Dr. Katsamakis stated that Ms. Herrera had unlimited stamina and that

34

the disease had not progressed.  Record at 350.  Consistent with all prior treatment notes, he recommended that she continue with the same dosage of Tsyabri and indicated that she was clinically stable.  *Id*.

The ALJ also discussed Dr. Rana's consultative examination, at which Ms. Herrera had normal speech, gait, and movement and complained of depression, fatigue, forgetfulness, and difficulty concentrating, but denied speech or eye problem.  Record at 26. The ALJ discussed Dr. Gil's consultative psychiatric examination, at which time she diagnosed Ms. Herrera with major depression recurrent without psychotic features, moderate in severity.  *Id*. Dr. Gil determined that Ms. Herrera had a mild degree of limitation in daily activities, moderate limitation of social functioning, and that her symptoms did not meet or equal the requisite listing of severity of functional limitations, though they were more than non-severe.  Record at 297.  In his psychological examination, Dr. Langgut concluded that Ms. Herrera has dysthmic disorder and Cognitive Disorder NOS.  Record at 301-304.  Dr. Langgut did not address any physical functional limitations other than Ms. Herrera's inability to complete domestic tasks at the same pace as she had in the past.  Record at 302. In discussing these evaluations, the ALJ acknowledged the established diagnosis of major depression, dysthymic disorder, and Cognitive Disorder NOS, but also the lack of any indication

35

that Ms. Herrera was unable to perform at the determined RFC. Record at 26-27.

Finally, the ALJ considered the evidence of the State agency physicians, namely Drs. Jackson, Pilapil, and Schneider. Record at 29. Dr. Jackson determined that Ms. Herrera had some moderate limitations but that she retained the functional capacity to complete simple and routine work. Record at 307. Dr. Pilapil determined that Ms. Herrera could occasionally lift or carries items of substantial weight; that she could sit, stand, and/or walk for about six hours in an eight-hour workday; that she was fully capable of pushing and pulling; and that she was capable of climbing ramps or stairs. Record at 310-11. Ms. Herrera informed Dr. Pilapil that she suffered from some fatigue, but he was unable to determine to what extent she suffered, because she did not return her ADLs. Record at 316. Dr. Schneider completed a psychiatric interview of Ms. Herrera, in which he noted some cognitive impairment but determined that Ms. Herrera's impairment did not meet the requisite listing criteria and that her functioning was somewhat improved from her last mental status exam. Record at 329. He also completed a Mental Residual Capacity Assessment, after which he concluded that Ms. Herrera maintained the capability to perform simple, repetitive tasks on a consistent basis. Record at 333.    Contrary to Ms. Herrera's

characterization, the ALJ provided substantial evidence for his determination and fully explained his reasoning.

2. *The ALJ's Evaluation of Dr. Katsamakis's Opinion*

Ms. Herrera next argues that the ALJ did not properly evaluate Dr. Kastamakis's opinion evidence.  In particular, Ms. Herrera argues that the ALJ failed to explain with specificity the weight he gave Dr. Kastamakis's opinions and failed to explain what medical facts contradict these opinions.

A treating doctor's opinion is entitled to "controlling weight" if it is adequately supported by objective medical evidence and consistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011).  If the ALJ discounts the opinion of a claimant's treating physician, he must offer "good reasons" for doing so.  *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir.2010); *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir.2008).  However, the ALJ need only "minimally articulate" these reasons for discounting the treating doctor's opinion, which is a lax standard.  *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir.2008) (quoting *Rice v. Barnhart,* 384 F.3d 363, 372 (7th Cir.2004)).

In November 2009, Dr. Katsamakis completed a Physical Capacities Assessment in which he stated that Ms. Herrera would only be able to sit for two hours and that she would be able to stand and/or walk for less than an hour during an eight-hour work

day; he also determined that Ms. Herrera was unable to lift any weight, push or pull, use her feet for repetitive movements, and that she would require 20 minutes of rest per one hour of work. Record at 336-39. He also completed a Mental Residual Function Capacity Assessment in which he stated that Ms. Herrera had many impairments, both marked and slight in nature. Record at 340-41. In November 2010, Dr. Katsamakis completed a Multiple Sclerosis Residual Functional Capacity Questionnaire in which he identified cognitive and physical conditions that rendered Ms. Herrera incapable of even a low stress job. Record at 379-80. He also stated that Ms. Herrera was unable to sit, stand, and/or walk for less than two hours in an eight-hour workday; that she would require six to eight breaks of ten to thirty minutes each, and that she was likely to be absent from a job for more than four days per month. Record at 379-81. On March 28, 2011, Dr. Katsamakis wrote a letter in which he expressed his opinion that Ms. Herrera was unable to maintain gainful employment due to her physical and cognitive disabilities. Record at 282-84. The ALJ gave little weight to the 2009 opinions and very little weight to the 2010 opinion, because, in his view, they were "not supported by objective medical evidence, or Dr. Katsamakis's own findings or treatment of the claimants. They are also inconsistent with the record as a whole." Record at 28. The record supports the

ALJ's analysis and determination that Dr. Katsamakis's opinion was not supported by the medical evidence.

For example, the ALJ cites to Dr. Katsamakis's treatment notes, beginning with a November 2007 note that acknowledges Ms. Herrera's complaints of "fatigue, memory loss, and speech difficulties," but states that Ms. Herrera was "'clinically stable' with no exacerbations or worsening of her condition." Record at 25. Ms. Herrera's next visit to Dr. Katsamakis was a year later, at which time an MRI revealed no major changes, and Mrs. Herrera still complained of cognitive difficulties. *Id*. Dr. Katsamakis maintained that Ms. Herrera's condition was stable, but he increased her Lexapro dosages to treat what he labeled "decreased motivation and mild depressive symptoms." *Id*. Through 2009, Dr. Katsamakis noted bladder problems, depression, fatigue, and some cognitive deficits, but he did not change any treatment regimen, and he stated that Ms. Herrera had unlimited stamina. Throughout the entire record, Dr. Katsamakis maintained consistent treatment of Ms. Herrera's MS and labeled her condition as stable.

The remaining medical evidence also contradicts Dr. Katsamakis's opinions. The ALJ gave Dr. Rana's consultative examination medial weight, as it was consistent with the record in the determination that Ms. Herrera could "sit, stand, walk, lift, carry, handle objects, hear, and speak without

39

limitations." Record at 28, 272-73. Dr. Rana determined that Ms. Herrera had no performance limitations aside from moderate difficulty in tandem walking and that she had a normal gait. Record at 272-73. The ALJ gave significant weight to Dr. Langgut's opinion, which indicated that Ms. Herrera had intact judgment, responsibility, arithmetic reasoning, and ability to understand the effects of her actions. Record at 28. Dr. Langgut noted that she had some difficulty with memory, but that she was able to remember six digits forward and four digits in reverse; that she was able to recall the previous day's weather, what she had eaten the previous night, and the first president; and that she appeared to be able to manage her own funds. Record at 304.

The ME testified that Ms. Herrera's impairments were strictly cognitive and that she exhibited no significant physical limitations other than fatigue, but that her impairments met listing criteria. Record at 29. The ALJ gave little weight to this testimony because the ME did not examine Ms. Herrera and his opinion is inconsistent with the record. *Id.* The ALJ also accounted for the reports of Drs. Jackson, Pilapil, and Schneider, which he determined are of the opinion that Ms. Herrera was able to "perform a reduced range of medium work." *Id*. Specifically, Dr. Jackson stated that Ms. Herrera was able to engage in simple and routine work activities and that her

40

symptoms did not meet the listing of severity of functional limitations. Record at 307. Dr. Pilapil completed a Physical Residual Functional Capacity Assessment that directly contradicts Dr. Katsamakis's Assessment. Dr. Pilapil determined that Ms. Herrera could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds; that she could sit, stand, and/or walk for six hours during an eight-hour workday; and that she was able to push and pull. Record at 310. Dr. Pilapil's assessment echoes Dr. Katsamakis's treatment notes in that he determined Ms. Herrera's MS was currently stable. Record at 316. Dr. Schneider also determined that Ms. Herrera's impairment did not meet listing criteria and even noted that her current functioning was an improvement from her previous exams. Record at 329. These opinions are inconsistent with Dr. Katsamakis's assessments, which indicate Ms. Herrera is a low-functioning individual physically, cognitively, and socially.

What is most significant is that Dr. Katsamakis's ultimate assessment is inconsistent with his own treatment notes and his prescribed course of treatment. In fact, his treatment notes and conservative, constant treatment recommendations are actually consistent with the evidence in the record, which suggests that Ms. Herrera's limitations were predominantly cognitive and not physical. It is Dr. Katsamakis's opinion evidence that marks a significant departure from his own notes and the remaining

medical evidence. Accordingly, the ALJ's evaluation of Dr. Katsamakis's opinion is supported by the record.

3. *The ALJ's Credibility Determination*

Next, Ms. Herrera challenges the ALJ's determination that her complaints were not fully credible. The ALJ's credibility determination is reviewed with deference. *Allen v. Astrue*, 721 F.Supp2d 769, 782 (N.D.Ill.2010) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)). An ALJ's credibility determination must contain specific reasons for his finding. *Steele v. Barhart*, 290 F.3d 936, 942 (7th Cir.2002). Indeed, "[i]n determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (citing 20 C.F.R. § 404.1529(c); SSR 96-7p; *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir.2002)).

The ALJ determined that "[t]he objective medical evidence, and other subjective factors, does not fully support her allegations of disability." Record at 27. In making his determination, the ALJ considered Mrs. Herrera's MRIs and progress notes, the clinical findings, her testimony concerning what she did in an average day, and the medical opinion evidence. The ALJ noted that Ms. Herrera did not always follow up with

treatment recommendations and that, on several occasions, she went a year or more between appointments, despite Dr. Katsamakis's instruction to follow up with him every three to four months. Record at 27. Specifically, Dr. Katsamakis stated in his November 2007 note that Ms. Herrera had not seen him in two years. Record at 265. During that particular visit, Dr. Katsamakis recommended that a follow-up be scheduled every three to six months. Record at 265-66. However, Ms. Herrera did not schedule a follow-up visit for another year. Record at 263. In his October 2008 note, Dr. Katsamakis stated, "she has not seen me in nearly a year. She is aware that follow-up is required every three to four months." Record at 263. It appears that Dr. Katsamakis's earlier recommendation of three to six months was a clerical error; regardless, Ms. Herrera did not return for a follow-up visit until well beyond the recommended time period.

The ALJ also expressed concern over Ms. Herrera's inconsistent complaints of speech difficulties. Record at 27. Dr. Katsamakis noted Ms. Herrera's complaints of speech difficulties in his treatment notes, but Ms. Herrera did not make any complaints of such difficulties during the examination completed by Dr. Rana in May 2009. Dr. Rana concluded that Ms. Herrera's speech was normal. Record at 272-73.

43

The ALJ also considered the conservative treatment regimen and the stability of Ms. Herrera's disease, as indicated by MRIs and progress notes. *Id.* At every visit, Dr. Katsamakis stated that Ms. Herrera's condition was stable and recommended she continue with the same dosage of Tsyabri. Record at 260, 263, 265-66, 342-44, 350-52, 336-39. The MRIs included in the record also revealed a stable condition, consistent with prior MRIs. Record at 262, 351, 356. In January 2010, Dr. Langgut completed a psychiatric interview of Ms. Herrera and determined that her current functioning was actually somewhat improved from her previous mental status exam. Record at 329.

Furthermore, the ALJ considered Ms. Herrera's statements concerning her abilities. The ALJ found Ms. Herrera's 2009 Function Report to be particularly telling; in the report, Ms. Herrera admitted that she was able to take care of her personal needs; do indoor and outdoor household chores; go out daily and to walk, drive, or ride in a car; take care of her personal finances; and play with her grandchildren. Record at 226-27. Ms. Herrera's abilities to complete such tasks does not comport with her complaints and testimony concerning her impairments. This disparity raises a legitimate concern of credibility.

In short, the ALJ provided specific reasons for his credibility findings and considered both Ms. Herrera's subjective

44

complaints and the objective evidence in reaching his determination.  The ALJ's determination is supported by substantial evidence in the record, and the Court affords deference to this finding.

## *Conclusion*

For the reasons set forth above, the Court rejects Ms. Herrera's challenges to the ALJ's findings concerning her RFC, Dr. Katsamakis' opinion, and her credibility.  The Court finds that the ALJ's 2010 decision is supported by substantial evidence and should be affirmed.  Accordingly, the Court denies Ms. Herrera's Motion for Summary Judgment [Docket #18] and grants the Commissioner's Motion for Summary Judgment [Docket #20].

Date: April 30, 2013

                                        E N T E R
                    E D:


                    _____
                    MAGISTRATE JUDGE ARLANDER KEYS
                    UNITED STATES DISTRICT COURT